UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x
ROBBIE KIRKLAND,                                              :   NOT FOR PRINT OR
                                                              :   ELECTRONIC PUBLICATION
                        Plaintiff,                            :
                                                              :   06 CV 4861 (ARR)
        -against-                                             :
                                                              :
MICHAEL J. ASTRUE,                                            :   **OPINION AND ORDER**
Commissioner of Social Security,                              :
                                                              :
                        Defendant.                            :
---------------------------------------------------------------- x
ROSS, United States District Judge:

Plaintiff Robbie Kirkland brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act. Plaintiff now moves for judgment on the pleadings, arguing that the record contains substantial evidence to establish her disability and that this case should remanded to the Social Security Administration ("SSA") solely for the calculation of benefits. The Commissioner, in a cross-motion, agrees that reversal is required, but contends that the case should be remanded to the SSA for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). For the reasons discussed below, the Commissioner's motion is granted and plaintiff's motion is denied.

## *BACKGROUND*

Plaintiff was born in Alabama on August 6, 1943 (436, 476).[1] She attended college, majoring in social work (448), but left after three and one-half years and before obtaining a degree (477, 478). In 1976, she began working for the New York State Department of Mental

---

[1] Numbers in parentheses denote pages in the Administrative Transcript.

Retardation ("OMRDD") as what is now called a "developmental aide" (436-37). In that capacity, plaintiff cared for mentally retarded individuals, aged 17 to 70 (437).

During her 22-year tenure at OMRDD, plaintiff worked in a "non-ambulatory wing," bathing, dressing, feeding and otherwise assisting individuals who were confined to wheelchairs or other, similar devices (479). The job required plaintiff to lift those individuals and to physically restrain them if they became combative (479). In the course of performing the latter duty, plaintiff sustained various injuries, including an injury to her right wrist (440-41, 479-80). In addition, plaintiff developed neck, shoulder and back problems (441, 480).

Sometime in the 1980's, plaintiff was diagnosed with chronic hypertension (222, 442). It is unclear precisely when plaintiff was diagnosed. Although plaintiff testified at a hearing before the ALJ in this case that she was first diagnosed in "the early '80's" (442), a report issued by one of her treating physicians, Dr. Joseph J. Nicolas, indicates that her hypertension was first diagnosed in July 1989 – four months prior to her initial visit to Dr. Nicolas (222).

Between November 14, 1989, and April 23, 1994, plaintiff paid monthly visits to Dr. Nicolas, who prescribed medication to control plaintiff's hypertension (222). However, on September 13, 1992, plaintiff was admitted to St. John's Episcopal Hospital in Far Rockaway, complaining of chest pain. Although plaintiff was noted as having a history of hypertension, her blood pressure at the time of admission was only 130/90 (89). Plaintiff was examined by cardiologists, but both her physical exam and electrocardiograms proved unremarkable (89). Her blood pressure was controlled, the chest pain did not recur and plaintiff was released from the hospital on September 16, 1992 (89). The discharge summary stated that plaintiff had "atypical chest pain, probably a likely significant coronary artery disease" (89). However, no one actually

diagnosed plaintiff as having coronary artery disease, and the cardiologists "suggested a GI workup" to rule out possible gastrointestinal causes (89).

Following her release from the hospital, plaintiff continued to work for OMRDD for another ten weeks or so. However, plaintiff alleges that during this period her blood pressure "became totally out of control" and she began to feel sick, with "[h]eadaches all the time" (480). She stopped working on December 3, 1992 (478), and, following her examination by State doctors, was placed on "lifetime disability" (480).

On October 26, 1993, plaintiff filed for DIB and SSI benefits, principally alleging that she had become disabled on December 3, 1992, as a result of her hypertension (60). Her application was initially denied on January 27, 1994 (61). Thereafter, plaintiff retained counsel who, on March 3, 1994, filed a request for reconsideration (64). Upon reconsideration, however, the SSA denied plaintiff's application for a second time (67).

On April 23, 1994, plaintiff – who was apparently no longer covered by health insurance – paid her last visit to Dr. Nicolas (222, 443). Three months later, on July 22, 1994, she went to Queens Hospital Center, complaining that she had run out of medication and had been experiencing pain in the area of her left armpit (91). The pain proved not to be cardiac in nature; an August 1994 mammogram revealed that plaintiff had enlarged lymph nodes (101). Thereafter, plaintiff had periodic follow-up visits with a Dr. S.K. Misra at the Drew Center, a satellite of the Queens Hospital (225, 443, 455).

Following her initial visit to Dr. Misra in August 1994 (225), plaintiff saw the doctor only from "time to time" because she could not always afford the co-payments (443). Although plaintiff exhibited high blood pressure at many of her visits to Dr. Misra, she was also noted to

3

have a history of noncompliance with respect to both medications and diet (109). Indeed, records dated March 3, 1995, and June 5, 1995, reflect that plaintiff had run out of medications weeks before her appointment (107, 112). Plaintiff continued to see Dr. Misra until June 1996 (225), when she began visiting South Island Medical Associates ("South Island"), a medical practice located in Far Rockaway (154).

*The Administrative Hearings*

On December 24, 1994, plaintiff requested a hearing before an administrative judge (64). That hearing was not actually held, however, until February 4, 1997. By that time, plaintiff had custody of her twin three-and-one-half-year-old granddaughters (449). At the hearing, plaintiff described the children, at least one of whom was "disabled," as very hyperactive and testified that she was single-handedly caring for them from morning until night, except for the period each day in which they attended school (450). In addition, plaintiff testified that she had been seeing the doctors at South Island for about eight months, stating that she first visited South Island "in '96 . . . probably June" (444), and that her "main doctor" there was Dr. Sinha, a cardiologist (443). The ALJ apparently made no effort to obtain South Island's records or any report or residual functional capacity assessment from Dr. Sinha.

The ALJ did, however, have written reports or evaluations from three physicians: a residual functional capacity form and narrative report from Dr. Nicolas, dated July 5, 1994, and June 1, 1994, respectively (86-88); an evaluation dated January 29, 1997, from Dr. Misra (225-227); and a medical assessment form and report of a November 15, 1996, examination conducted by Dr. Darius Winter, an independent medical consultant hired by the New York State Department of Social Services (76-78, 82-84). Dr. Nicolas's documents indicated that plaintiff

4

was suffering from "very severe type" hypertension, could only sit for three hours and could stand or walk for less than an hour during an eight-hour workday (86), and was "unfit for work" (88). Dr. Misra's evaluation described plaintiff's symptoms as "mainly low back ache radiating down the left leg," and opined that plaintiff could sit for four or five hours and stand or walk for another four or five hours during an eight-hour period (226). Dr. Winter's report opined that plaintiff could sit without limitation, but that she could walk for only half an hour (78, 82).

On May 13, 1997, ALJ Manuel Cofresi issued a six-page decision (35-43), finding that plaintiff was not disabled within the meaning of the Social Security Act (39). Although none of the three physicians had opined that plaintiff could both sit for six hours and stand or walk for more than two hours during an eight-hour period, the ALJ concluded that plaintiff was "capable of at least light work" (41). Relying on Dr. Winter's report and on the fact that plaintiff was capable of caring for her granddaughters, the ALJ discounted Dr. Nicolas's opinions as "totally unsupported by medically acceptable clinical and laboratory diagnostic techniques" (40). Although plaintiff's counsel had submitted Dr. Misra's evaluation to the ALJ following the hearing (45), the ALJ made no mention of this evaluation.

Plaintiff's counsel sought review of the ALJ's decision and on February 25, 1998, sent the Appeals Council a one-page narrative report from a South Island doctor, Rakesh Gupta, and South Island medical records for the period between February 9, 1997, and February 2, 1998 (153). However, while Dr. Gupta's report stated that plaintiff had been a patient at South Island since June 12, 1996 (154), plaintiff's counsel offered no explanation as to why no records were available for the eight-month period between June 12, 1996, and February 9, 1997. Moreover, Dr. Gupta's narrative contained no assessment of plaintiff's residual functional capacity, but

5

conclusorily stated that plaintiff could not return to her former job and would be unable to perform other full-time work because of her uncontrolled high blood pressure (154).

The Appeals Council granted plaintiff's request for review and on February 19, 1999, vacated the hearing decision and remanded the case for further proceedings (144-46). The Appeals Council noted that the record did not contain substantial evidence to support the conclusion that plaintiff was capable of light work, since even Dr. Winter's assessment – which stated that plaintiff could not sit for a total of two hours during an eight-hour workday – indicated that plaintiff was unable to perform the full range of sedentary work (144). However, the Appeals Council also noted that "a significant amount of medical evidence [was] missing from the file," including the residual functional capacity assessment from Dr. Misra.[2] In addition, the Appeals Council found that, in the absence of any testimony from a vocational expert, that there was no support for the ALJ's conclusion that plaintiff's work skills were transferable (145). The case was remanded with directions that the ALJ obtain (1) complete medical records, (2) "evidence from a medical expert to clarify the severity of the [plaintiff's] impairments and their effects on her work activities for the entire period at issue" and (3) "evidence from a vocational expert to clarify the issue of transferable skills and to identify appropriate jobs within the claimant's vocational profile and their incidence in the national economy" (145).

Upon remand, the case was again assigned to ALJ Cofresi, who scheduled a second hearing for November 5, 1999 (167). Prior to that hearing, plaintiff's counsel mailed the ALJ a "Physical Residual Functional Capacity Questionnaire" dated March 22, 1999, which had been

---

[2]Because of a typo which appeared in plaintiff's counsel's December 9, 1997, letter requesting review of the ALJ's decision, the Appeals Council's order referred to Dr. S. K. Misra as "Dr. Skmisra" (145).

prepared by Dr. Eastlyn Harding-Marin of MedPort of Rockaway Beach – a practice which plaintiff had first consulted in September 1998 (171-77). In that questionnaire, Dr. Harding-Marin stated that plaintiff had "uncontrolled/grade 3" hypertension and was suffering from dizziness and intermittent headaches (172). However, the doctor's assessment of plaintiff's residual functional capacity was internally inconsistent; she opined that plaintiff could sit continuously for more than two hours and could stand continuously for 45 minutes, but also indicated that plaintiff could neither stand nor sit for a total of more than two hours in the course of an eight-hour workday (174).

Shortly before the second hearing, Dr. Nicolas issued an updated medical report dated October 2, 1999 (222-34). The report stated that plaintiff had severe hypertension and angina pectoris, and that her blood pressure had been 180/100 on April 23, 1994 – the date of her last visit to Dr. Nicolas's office (222). However, the report at least implied that this elevated blood pressure reading might have been related to noncompliance, stating "she ran out of medicine x 4 days" (223). In addition, in marked contrast to the assessment contained in Dr. Nicolas's own July 5, 1994, evaluation – in which he opined that plaintiff could stand/walk for less than one hour and sit for less than three – the October 1999 report stated that plaintiff could stand and/or walk for up to two hours and sit without limitations (224).

At the November 5, 1999, hearing, ALJ Cofresi took testimony from a medical expert, Dr. Richard Wagman. This SSA-retained expert disagreed with Dr. Nicolas's conclusion that plaintiff was suffering from "very severe type" hypertension, stating that "very severe" implied "significant end organ involvement" and that there was "really . . . very minimal" end-organ involvement in this case (511). In addition, Dr. Wagman opined that a negative cardiac

catheterization test proved that a May 1997 thallium stress test which found "borderline evidence of ischemia in the right coronary artery" (157) was a false positive (500). Dr. Wagman found no evidence to support Dr. Harding-Marin's diagnosis of angina (496). Although Dr. Wagman had never examined plaintiff, he concluded that she could sit and stand normally, could lift 20 pounds on a regular basis and could occasionally lift 50 pounds (497).

On examination by plaintiff's counsel, Dr. Wagman conceded that consistently high blood pressure could cause dizziness and headaches (507), but stated, "Again, we have noncompliance recorded here too" (507). However, when asked if noncompliance could have caused the fluctuation in blood pressures which appears in the record, Dr. Wagman declined to offer an opinion, saying, "I can't be sure because that is not something that is clearly stated in the record" (512).

A vocational expert, Dr. Fred Siegel, also testified at the hearing. He stated that plaintiff's former position as a mental retardation aide was skilled, medium-exertion job (520). When asked what skills plaintiff had acquired as a result of that work, Dr. Siegel stated:

> She related to the children. She accompanied them on, I think, shopping trips. She attended to their routine self-care . . . and possibly also assisted them in recreational activities (520).

Dr. Siegel then testified that those skills were transferable into other areas of work, and listed various jobs that used those skills (520-21).

On December 13, 1999, ALJ Cofresi issued his second decision with respect to this matter, concluding that plaintiff was not disabled in that she was "able to return to the type of job that she performed in the past" (291). In so ruling, the ALJ discounted the opinions of every doctor other than Dr. Wagman – even Dr. Winter (298-99). The ALJ expressly noted the

8

discrepancy between the residual functional capacity assessments set forth in Dr. Nicolas's July 1994 and October 1999 reports, but made no attempt to resolve the inconsistency (298). Rather, he used the inconsistency as a basis for discounting Dr. Nicolas's testimony altogether. In addition, the ALJ noted that there was "a question of the [plaintiff's] compliance with prescribed medical treatment," and that 20 C.F.R. 404.1530 specified "that failure to follow a prescribed course of treatment precludes a finding of disability" (298), but made no effort to resolve the noncompliance issue. Instead, after an exhaustive review of the record, the ALJ simply concluded:

> Based on the above evidence, the undersigned find that the [plaintiff], when compliant with medication, retains the residual functional capacity to perform the exertional demands of medium work, or work which requires maximum lifting of 50 pounds and frequent lifting of up to 25 pounds (300).

Plaintiff's counsel sought review of this decision and, on September 11, 2002, the Appeals Council remanded the case for a second time (313-15). The Appeals Council ruled that the ALJ had failed to resolve the issue of noncompliance or to provide a "function by function assessment of the claimant's sustainable work capacity" (314). The ALJ was directed to further evaluate the treating source opinions, and was reminded that he could "request the treating source to provide additional evidence and/or clarification of the opinion as well as a medical source statement about what the claimant can still do despite the impairments" (314). The Appeals Council also suggested that the transferable skills listed by Dr. Siegel – the ability to relate to children, assist them with self-care and assist with recreational activities – might not be "actual work skills," but might be skills developed by "performing everyday, non-work related activities" (313). The Appeals Council directed the ALJ to obtain supplemental evidence from a vocational expert concerning, inter alia, the issue of whether plaintiff had "acquired any skills that are both

9

transferable and transferable with very little, if any, vocational adjustment to other occupations" (314).

Following the remand, ALJ Cofresi scheduled his third hearing regarding this case for March 25, 2003. On February 18, 2003, plaintiff's counsel sent the ALJ copies of medical records obtained from Dr. Michael Belfiore, who plaintiff had visited in 2000, 2001 and 2002 (320). These records indicate that plaintiff had first visited Dr. Belfiore on December 27, 2000, stating that she had a history of hypertension and that she had run out of medication three days earlier (404). Over the course of the next two years, Dr. Belfiore sent plaintiff to numerous specialists, including a cardiologist, Dr. Michael D. Teigman. At his first consultation with plaintiff on April 16, 2002, Dr. Teigman diagnosed her as having hypertensive cardiovascular disease (354). However, after a stress test performed on May 22, 2002, proved normal, and after plaintiff reported no chest pains, dizziness or syncopal episodes, and had blood pressure of 140/80 at a follow-up visit on October 22, 2002, Dr. Teigman opined that plaintiff was "quite stable on the current medications," and was "well controlled in her hypertensive heart disease" (333).

At the March 25, 2003, hearing, the ALJ again took testimony from Dr. Wagman. This time, when the ALJ asked if plaintiff's elevated blood was due to noncompliance, Dr. Wagman felt able to offer an opinion and responded, "Frequently, yes" (546). However, on examination by plaintiff's counsel, Dr. Wagman proved unable to identify more than two specific instances in which plaintiff had been noncompliant and appeared unsure if there even were other instances, saying, "There may be more. I don't really know" (548).

As in his previous testimony, Dr. Wagman conceded that high blood pressure could cause dizziness (552). This time, however, the doctor testified that plaintiff's blood pressure – which

he characterized as mostly "in the 160 over 90 range" – was usually too low to result in headaches (553). Yet, the doctor stated that he had no reason to disbelieve plaintiff's claim that the medication she was taking made her groggy (553).

The ALJ also took testimony from a vocational expert, Amy Leopold. Ms. Leopold testified that plaintiff would have "acquired counseling and supervising skills" through her job at OMRDD, as well as "skills in teaching, self-care training, and . . . activities of daily living" (559). Ms. Leopold further testified that these skills were transferrable to other jobs, such as nursery school attendant, playroom attendant, and first aide attendant (559-60).

On February 24, 2004, ALJ Cofresi issued his third decision in this case, once again finding that plaintiff was not disabled (15). As directed by the Appeals Council, the ALJ attempted to resolve the issue of noncompliance, but he did so in a conclusory, perfunctory manner. The ALJ simply stated:

> It is clear from the record that the [plaintiff] has been non-compliant with prescribed treatment, in particular medication and diet. Hospital records repeatedly stated that she failed to take anti-hypertensive medication, for whatever reason, and that this directly contributed to the elevation of her blood pressure levels (21).

The ALJ did not identify the "hospital" to which he was referring, much less indicate where the hospital's records stated that noncompliance contributed to plaintiff's elevated blood pressure.

The ALJ not only made no effort to solicit plaintiff's treating physicians' opinions regarding plaintiff's noncompliance, but used the physician's failure to address the noncompliance issue as a reason for ignoring their opinions. The ALJ conclusorily dismissed the opinions of Drs. Nicolas, Misra and Harding-Marin as "based on the claimant's subjective symptomatology," then stated, "None of them took into account the undeniable fact of the claimant's failure to comply with prescribed medications and diet" (22). The ALJ again noted

11

the inconsistency between Dr. Nicolas's July 1995 functional capacity assessment – in which he stated that plaintiff could sit for three hours and stand/walk for less than an hour during an eight-hour workday – and his October 1999 report, in which he stated that plaintiff could stand/walk for two hours and sit without limitation (17). However, the ALJ made no effort to resolve this inconsistency.

As in his previous decision, the ALJ concluded that plaintiff would be capable of returning to her prior work if she were compliant with prescribed treatment (22). The ALJ further opined that, even if noncompliant, plaintiff could still perform the full range of light work (22). Based on these conclusions, the ALJ reasoned that Medical-Vocational Rule 202.22 mandated a finding of "not disabled" for someone of plaintiff's age and "vocational factors" (23).

Once again, plaintiff sought review of the ALJ's decision. On March 11, 1005, plaintiff's counsel sent the Appeals Council a letter listing various defects in the ALJ's decision (425). Plaintiff's counsel noted, inter alia, that the ALJ had (1) failed to follow the treating physician rule, (2) failed to re-contact the treating physicians as directed by the Appeals Council, (3) substituted his own opinion for those of the physicians, and (4) incorrectly stated that Dr. Wagman had testified that noncompliance was mentioned several times throughout the record (425-27). Although the Commissioner is now prepared to concede that plaintiff was correct in at least some of these respects, the Appeals Council denied review on July 19, 2006, making the ALJ's February 26, 2004, decision the Commissioner's final decision in this case (4-6).

*The Instant Action*

On September 8, 2006, plaintiff commenced this action. Plaintiff now moves for judgment on the pleadings, primarily arguing that the ALJ failed to follow the treating physician rule. Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings

12

("Plaintiff's Memo") at 18-21. As part of that argument, plaintiff notes that the ALJ did not engage in the four-factor analysis required under the Commissioner's rules (S.S.R. 82-59) and, therefore, failed to consider whether medication would have enabled plaintiff to return to substantial gainful activity or whether there was evidence of plaintiff's noncompliance (Id. at 20-21). Plaintiff further asserts that there was no evidence to support the ALJ's conclusion that plaintiff could return to her past work if she took the prescribed medications (Id. at 20-21). In addition, plaintiff argues that the vocational expert's testimony was flawed because Ms. Leopold was never accurately apprised of plaintiff's impairments (id. at 21-22), and that the ALJ improperly evaluated plaintiff's credibility (Id. at 22-24).

Following service of plaintiff's motion, the Commissioner cross-moved to remand this case for further administrative proceedings. In a Memorandum of Law in Support of Defendant's Motion for Remand and in Opposition to Plaintiff's Motion for Judgment on the Pleadings ("Defendant's Memo"), the Commissioner concedes that the ALJ "did not adequately develop the record and did not properly evaluate the severity of plaintiff's impairments or her residual functional capacity" (Id. at 14). Specifically, the Commissioner notes that the ALJ did not identify which of plaintiff's impairments were severe, failed to re-contact the physicians for additional information or clarification, and failed to explain how he determined plaintiff's residual functional capacity (Id. at 14-15). In addition, citing to eight instances in which the medical records refer to plaintiff's noncompliance, the Commissioner implies that remand is appropriate "for proper evaluation" of the noncompliance issue (Id. at 16).

While both parties agree that the ALJ's decision was flawed, the parties disagree as to what relief is appropriate. Plaintiff points out that plaintiff first applied for benefits in 1993, and that the ALJ has failed to comply with the Appeals Council's orders (Plaintiff's Memo at 24).

Citing to Lesko v. Shalala, No. 93-CV-2210 (ARR), 1995 WL 263995, at *8-9 (E.D.N.Y. Jan. 5, 1995), plaintiff argues that remand for calculation of benefits is appropriate in this instance (Id. at 25). The Commissioner, on the other hand, argues that this court should remand the case pursuant to the fourth sentence of 42 U.S.C. § 402(g) because the ALJ "failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the law and regulations" (Defendant's Memo at 12).

## *DISCUSSION*

The court's role in reviewing decisions of the SSA is narrowly confined to assessing whether the Commissioner applied the correct legal standards in making his determination and whether that determination is supported by substantial evidence. See 42 U.S.C. §§ 405(g), 1383(c); Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987); Donato v. Secretary, 721 F.2d 414, 418 (2d Cir. 1983). In this case, however, the Commissioner concedes that reversal of his final decision is warranted due to errors committed by ALJ Cofresi. Therefore, the only issue before the court is whether the matter should be reversed and remanded to the Commissioner for (a) further administrative proceedings, or (b) solely for the calculation of benefits.

The court has the authority to reverse a decision of the Commissioner with or without remanding the matter for a rehearing. See 42 U.S.C. § 405(g). Remand for further development of the evidence is appropriate where there are gaps in the administrative record or the ALJ has applied an improper legal standard. See, e.g., Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999); Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996); Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980); Cutler v. Weinberger, 516 F.2d 1282, 1287 (2d Cir. 1975). Remand for additional proceedings is particularly appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, "'further findings would . . . plainly help to assure the

14

proper disposition of [a] claim.'" Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004) (quoting Rosa, 168 F.3d at 83). On the other hand, when there is "persuasive proof of disability" in the record and "no apparent basis to conclude that a more complete record might support the Commissioner's decision," further evidentiary development would not serve any purpose. Rosa, 168 F.3d at 83; Parker, 626 F.2d at 235. In that case, the court should reverse the Commissioner's decision and remand solely for the calculation of benefits. See, e.g., Balsamo v. Chater, 142 F.3d 75, 82 (2d Cir. 1998); Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 644 (2d Cir. 1983).

Although plaintiff cites to this court's 1995 decision in Lesko for the proposition that remand for the calculation of benefits may be appropriate "when the ALJ has failed to follow the regulations and the Appeals Council's explicit instructions," Defendant's Memo at 25, Lesko does not stand for so broad a proposition. In Lesko, the plaintiff had long established that he was unable to return to his past work. Lesko, 1995 WL 263995, at *8. Accordingly, the only issue which remained to be resolved was whether Lesko was able to engage in other "gainful employment in the national economy." Id. Since the Commissioner bore the burden of proof with respect to that issue, this court found that it would be unfair to permit the Commissioner's own delays to inure to the disadvantage of the plaintiff.

In cases in which the claimant has not yet carried the burden of showing an inability to perform past relevant work, however, a remand for the calculation of benefits simply on account of the Commissioner's mistakes or inaction is inappropriate. In Bush v. Shalala, 94 F.3d 40 (1996), for example, the plaintiff's disability claim had been pending in various courts for ten years, but the plaintiff had not yet shown that her impairment interfered with her capacity to perform relevant past work. The district court, "outrage[d]" at the lengthy delay, remanded for

the calculation of benefits. The Second Circuit reversed the district court, holding that "absent a finding that the claimant was actually disabled, delay alone is an insufficient basis on which to remand for benefits." Id., 94 F.3d at 46. Thus, even where the responsibility for lengthy delays lies with the Commissioner, a remand for the calculation of benefits is appropriate only where the plaintiff has already met the burden of proving entitlement to benefits, and where the only issue remaining is whether the Commissioner can prove the existence of other appropriate jobs. See Butts v. Barnhart, 416 F.3d 101, 104 (2005) ("our holding is limited to cases where the claimant is entitled to benefits absent the Commissioner's providing expert vocational testimony about the availability of appropriate jobs").

In this case, this court agrees with the Commissioner that remand for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 402(g) is appropriate. Although it has been almost 15 years since plaintiff first filed for benefits, there are still significant gaps in the record and inconsistencies in the medical evidence. Accordingly, it is not yet clear whether plaintiff can meet her burden of proof.

First, while the record indicates that plaintiff began visiting South Island in June 1996 (154), there is no record of any visits between June 1996 and February 1997. The only records from South Island which appear in the Administrative Transcript are for the one-year period between February 1997 and February 1998. Therefore, it appears that the record is missing evidence relating to a crucial eight-month period. In addition, although plaintiff testified at the initial hearing that a cardiologist named Dr. Sinha was her principal physician at South Island (443), the record does not contain a meaningful report or residual functional capacity analysis from this doctor. To be sure, the record does contain a one-page narrative report from one of Dr.

16

Sinha's colleagues, Dr. Gupta (154). However, that narrative does not include an assessment of plaintiff's residual functional capacity, but conclusorily states that plaintiff could not return to her former job and would be unable to perform other full-time work because of her uncontrolled high blood pressure (154).

There are also inconsistencies and ambiguities in the medical record. The most glaring inconsistency is the one which exists between Dr. Nicolas's July 1994 residual functional assessment and his October 1999 report. In the former, Dr. Nicolas stated that plaintiff could sit for only three hours in the course of an eight-hour day and could not even stand or walk for an hour. However, in the July 1999 report, Dr. Nicolas opined that plaintiff could stand/walk for two hours during the eight-hour period and sit without limitation. This discrepancy cannot be explained by new observations, since Dr. Nicolas last examined plaintiff in April 1994. However, one cannot simply assume that the July 1994 assessment is accurate because of its proximity to the dates of treatment; it is at least possible that the October 1999 report – prepared at a time when plaintiff was clearly never returning as a patient – was more dispassionate and accurate. There is also an internal inconsistency in Dr. Harding-Marin's March 1999 residual functional capacity assessment, in which she first opined that plaintiff could sit continuously for more than two hours and could stand continuously for 45 minutes, but then indicated that plaintiff could neither stand nor sit for a total of more than two hours in the course of an eight-hour working day (174).

In addition, there are ambiguities with respect to the report and residual functional capacity evaluation of Dr. Misra. Dr. Misra considered plaintiff's back problems to be her principal complaint. Accordingly, it is unclear whether Dr. Misra's assessment that plaintiff

17

could sit for four to five hours and stand or walk for four to five hours in the course of an eight-hour day has anything to do with plaintiff's hypertension, or whether it relates solely to impairments caused by her back injury. Comments in the margins of Dr. Misra's report contain references to "HTN" (i.e., hypertension), but the relevant portions of these comments were not fully reproduced on the copy of the report which is contained as page 225 of the Administrative Transcript filed with the court.

Moreover, the treating physicians were never contacted with respect to the issue of noncompliance. Although plaintiff is correct in noting that Dr. Wagman could identify only two instances in which noncompliance was noted in the medical records, this court agrees with the Commissioner that several other instances exist. Indeed, Dr. Misra's records state that plaintiff had a history of noncompliance with respect to both medications and diet (109). However, the degree to which plaintiff failed to take prescribed medications remains unclear. It is also unclear whether those medications, if taken religiously, would have controlled plaintiff's hypertension and permitted her to return to work.

Finally, the ALJ failed to apply appropriate legal standards. The ALJ did not adequately explain why he was rejecting the opinions of the treating physicians in favor of the testimony of Dr. Wagman, a doctor who never actually examined plaintiff. In addition, in deciding that plaintiff was noncompliant, the ALJ failed to engaged in the four-factor analysis required under the Commissioner's rules. See S.S.R. 82-59.

## *CONCLUSION*

As set forth above, remand is appropriate both because the ALJ applied improper legal standards and because "further findings would . . . plainly help to assure the proper disposition of

[the] claim." See Butts, 388 F.3d at 386; Rosa, 168 F.3d at 82-83. Accordingly, this case is remanded to the Commissioner for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

s/ Judge Allyne R. Ross
Allyne R. Ross
United States District Judge

Dated: January 29, 2008
Brooklyn, New York

SERVICE LIST:

Attorney for Plaintiff

Charles E. Binder
Binder & Binder, P.C.
215 Park Avenue South, 6th floor
New York, NY 10003


Attorney for Defendant

John M. Kelly
United States Attorneys Office
One Pierrepont Plaza, 14th Floor
Brooklyn, NY 11201